UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ORIGINAL

- - - - - - - - - - - - - - - - x
                         :

UNITED STATES OF AMERICA           :

    v.                     :

JAMES TAGLIAFERRI,            :

             Defendant.    :

- - - - - - - - - - - - - - - - x

**SEALED
INDICTMENT**

13 Cr.

# 13 CRIM 115

## COUNT ONE

(Investment Adviser Fraud)

The Grand Jury charges:

### Relevant Persons And Entities

1.    At all times relevant to this Indictment, JAMES
TAGLIAFERRI, the defendant, provided investment advisory services
to clients through various companies that TAGLIAFERRI managed and
controlled.

2.    From at least in or about 2007 to at least in or
about 2011, JAMES TAGLIAFERRI, the defendant, provided investment
advisory services through TAG Virgin Islands, Inc., and its
successor, TAG Virgin Islands, LLC (together, "TAG"). At all
times relevant to this Indictment, TAG had its principal place of
business in St. Thomas, U.S. Virgin Islands. TAG was a
registered investment adviser with the U.S. Securities and
Exchange Commission (the "SEC").

3.    From in or about at least the 1980s to in or about
2006, JAMES TAGLIAFERRI, the defendant, provided investment

JUDGE ABRAMS

advisory services through an entity named Taurus Advisory Group LLC ("Taurus").  Taurus was headquartered in Connecticut.

    4.   At all times relevant to this Indictment, a company based in Garden City, New York was a privately held corporation ("Company 1").

    5.   At all times relevant to this Indictment, a company based in New York, New York was a publicly-traded company ("Company 2").  Company 2's shares were quoted on the electronic interdealer quotation systems operated by the OTC Markets Group (commonly known as the "Pink Sheets").

    6.   At all times relevant to this Indictment, a company based in Berwyn, Pennsylvania was a privately held corporation ("Company 3").

    7.   At all times relevant to this Indictment, an individual and his brother were involved in a number of business entities that received TAG client funds ("Associate 1" and "Associate 1's Brother").  Beginning in or about January 2008, Associate 1 exercised substantial control of Company 2.  In or about April 2007, as the result of an action commenced by the SEC, Associate 1 was judicially barred from serving as an officer or director of a publicly-traded company for a period of five years.

### Relevant Background

8.    In or about February 2009, JAMES TAGLIAFERRI, the defendant, reported to the SEC that TAG had over 100 clients and approximately $252 million in client funds under management.

9.    In connection with his investment advisory business, JAMES TAGLIAFERRI, the defendant, generally caused his clients to execute an investment management agreement with Taurus or TAG (the "Investment Agreement"). Pursuant to the Investment Agreements, TAG/Taurus exercised wide discretion in making investment decisions on behalf of individual clients.

10.    Client accounts managed by TAG were maintained at certain financial institutions.  Pursuant to the discretion provided to TAG/Taurus in the Investment Agreements, JAMES TAGLIAFERRI, the defendant, could effect the withdrawal of client funds from these client accounts to make investments on behalf of his clients.  TAGLIAFERRI, or those working at his direction, generally sent instructions to the financial institution to transfer funds out of a given client's account.  The purpose of such transfers included purchasing securities and paying fees to TAG.  Generally, the financial institutions holding the TAG client accounts issued monthly statements to the clients reflecting account activity.  These statements also reflected the stated purpose for the transfers of funds in and out of the client accounts, as had been described by TAGLIAFERRI or his

3

employees to the financial institution.

11.   Through Taurus and TAG, JAMES TAGLIAFERRI, the defendant, charged clients a fee for his investment advisory services.  These fees, which were referenced in the Investment Agreements, were typically calculated as a percentage of total assets under TAG's management.  Between in or about 2007 and 2010, TAGLIAFERRI collected at least approximately $4.3 million in investment advisory fees from his clients.  These fees were typically drawn from clients' investment accounts at financial institutions and reflected on account statements sent to clients.

## The Scheme to Defraud

12.   From at least in or about 2007 through at least in or about 2010, JAMES TAGLIAFERRI, the defendant, participated in a scheme to defraud his investment advisory clients.  In general, rather than making investment decisions based upon the best interests of his clients, as he was legally obligated to do, TAGLIAFERRI instead made investment decisions for his clients based on his own interests and those of his close associates, including Associate 1.  TAGLIAFERRI also engaged in numerous transactions and took other steps to disguise and conceal the true purposes behind the investments he purportedly made for the benefit of his clients.  TAGLIAFERRI's scheme to defraud included the following, among other things:

4

a.    Without his clients' knowledge or consent, TAGLIAFERRI received for his own benefit, and the benefit of his company, millions of dollars in payments in exchange for placing his clients' money in investments in either: (i) Company 1, or (ii) one of various companies affiliated with Associate 1 and Associate 1's brother (collectively, the "Associate Companies"). These payments often were calculated as a percentage - which was sometimes as high as 10% - of the total client funds that TAGLIAFERRI caused to be invested in Company 1 or the Associate Companies.  TAGLIAFERRI did not disclose these payments to his clients and, in some instances, falsely described them as "consulting" fees in order to conceal their true purpose.  In total, TAGLIAFERRI directed more than $120 million of his clients' money to Company 1 and the Associate Companies.

b.    At various times, TAGLIAFERRI used his clients' funds for his own interests - rather than his clients' best interests - by causing clients to purchase securities from other accounts that TAGLIAFERRI controlled.  TAGLIAFERRI executed these transactions in order to generate money to meet the cash needs of TAG and other companies with which TAGLIAFERRI was affiliated.

c.    In order to deceptively obtain client funds for this purpose, TAGLIAFERRI executed a complex series of trades among and between his clients' accounts to generate cash.  These

trades were generally driven by TAGLAFERRI's own interests, and not the best interests of his clients. First, in order to generate cash from client accounts, TAGLIAFERRI caused certain clients to purchase securities from other client accounts over which TAGLIAFERRI also exercised control ("Intermediary Accounts"). These Intermediary Accounts were held in the name of certain of the Associate Companies. Second, once client funds were transferred to these Intermediary Accounts, TAGLIAFERRI used these funds for his own benefit, including to pay back other clients who were demanding their money and to pay for expenses of companies with which TAGLIAFERRI was affiliated.

      d. Also as part of the scheme, TAGLIAFERRI caused to be placed in certain client accounts false and fraudulent securities (the "Sub Notes"). The Sub Notes provided that Company 3 was obligated to pay certain TAG clients. According to the Sub Notes, this obligation was premised on a purported promissory note between Company 3 and TAG which obligated Company 3 to make payments to TAG. As TAGLIAFERRI well knew, however, this promissory note between Company 3 and TAG did not exist. Accordingly, the reference in the Sub Notes to Company 3's payment obligations to TAG clients was false, contrary to the representations made by TAGLIAFERRI.

**TAGLIAFERRI Obtained Undisclosed Payments In Exchange for
Placing Client Funds In Particular Companies**

**A.    Payments Relating to Company 1**

13.    From in or about March 2007 to at least in or about April 2008, JAMES TAGLIAFERRI, the defendant, obtained at least approximately $1.6 million in undisclosed payments from Company 1 in exchange for placing client funds in investments relating to Company 1.  In total, TAGLIAFERRI placed more than $40 million of client funds in investments relating to Company 1.

14.    On several occasions, JAMES TAGLIAFERRI, the defendant, first caused client funds to be transferred from the client accounts TAGLIAFERRI managed to an attorney trust account maintained in the Southern District of New York (the "Trust Account").  These transfers typically appeared on client statements as transfers for the purchase of securities, including promissory notes, issued by Company 1.  However, instead of transferring the full amount of clients funds from the Trust Account to Company 1, TAGLIAFERRI, with the knowledge of Company 1, caused a portion of the client funds to be diverted to a TAG bank account in the U.S. Virgin Islands, over which TAGLIAFERRI had signature authority (the "TAG Virgin Islands Account").  As a result, not all of the client funds were actually transferred to Company 1.  The portion of funds that was not transferred to Company 1 was used to fund the undisclosed payments TAGLIAFERRI received from Company 1 in exchange for causing his clients to

invest in Company 1.

15.   These undisclosed payments obtained by JAMES TAGLIAFERRI, the defendant, were sent to TAG from the Trust Account or from accounts held by Company 1.   The account statements received by TAG clients, however, did not reflect that a portion of the funds transferred from their accounts for the purchase of securities in Company 1 had been diverted to the TAG Virgin Islands Account.

16.   For example, on or about June 11, 2007, JAMES TAGLIAFERRI, the defendant, caused to be wired approximately $1.5 million in TAG client funds from client accounts to the Trust Account.   Account statements for these TAG clients indicated that these transfers were for the purchase of notes in Company 1.   In truth and in fact, approximately 10 percent of these client funds, or $150,000, was diverted to TAGLIAFERRI, and only 90 percent of the funds was actually sent to Company 1. Specifically, on or about June 12, 2007, $1,350,000 was sent from the Trust Account to an account held by Company 1.   The remaining $150,000, approximately 10% of the $1.5 million, was sent to the TAG Virgin Islands Account.   This $150,000 in client funds was never transferred to  Company 1; rather, it was diverted to TAGLIAFERRI for his own use and benefit.   TAGLIAFERRI never disclosed to relevant clients that a portion of their funds intended for investment in Company 1 had been diverted to the TAG

8

Virgin Islands Account.

17.   On another occasion, on or about July 2, 2007, JAMES TAGLIAFERRI, the defendant, caused to be wired approximately $1.2 million in TAG client funds to the Trust Account.  This included, among amounts from other TAG clients, approximately $50,000 from a particular TAG client ("Victim 1"). Account statements for these TAG clients, including Victim 1, indicated that these transfers were for the purchase of notes in Company 1.  In truth and in fact, approximately 10 percent of these client funds, or $120,000, was diverted to TAGLIAFERRI, and only 90 percent of the funds was actually sent to Company 1. Specifically, on or about July 3, 2007, $1,080,000 was sent from the Trust Account to an account held by Company 1.  The remaining $120,000, approximately 10% of the $1.2 million, was sent to the TAG Virgin Islands Account.  This $120,000 in client funds was never transferred to Company 1; rather, it was diverted to TAGLIAFERRI for his own use and benefit.  TAGLIAFERRI never disclosed to relevant clients that a portion of their funds intended for investment in Company 1 had been diverted to the TAG Virgin Islands Account.

18.   On a third occasion, on or about July 16, 2007, JAMES TAGLIAFERRI, the defendant, caused to be wired approximately $1.875 million in TAG client funds to the Trust Account.  This included, among amounts from other TAG clients,

approximately $600,000 from a particular TAG client ("Victim 2")
and approximately $75,000 from another TAG client ("Victim 3").
Account statements for these TAG clients, including Victim 2 and
Victim 3, indicated that these transfers were for the purchase of
notes in Company 1.  In truth and in fact, approximately 10
percent of these client funds, or $187,500, was diverted to
TAGLIAFERRI, and only 90 percent of the funds was actually sent
to Company 1.  Specifically, on or about July 17, 2007,
$1,687,500 was sent from the Trust Account to an account held by
Company 1.  The remaining $187,500, approximately 10% of the
$1.875 million, was sent to the TAG Virgin Islands Account.  This
$187,500 in client funds was never transferred to Company 1;
rather it was diverted to TAGLIAFERRI for his own use and
benefit.  TAGLIAFERRI never disclosed to relevant clients that a
portion of their funds intended for investment in Company 1 had
been diverted to the TAG Virgin Islands Account.

        19.  In or about the summer of 2008, JAMES TAGLIAFERRI,
the defendant, learned of an SEC inquiry relating to Company 1.
After learning of the SEC inquiry, TAGLIAFERRI caused to be sent
backdated invoices to Company 1 relating to many of the payments
that TAG had received in exchange for placing client investments
in Company 1.  These invoices, which often reflected the precise
amounts that TAGLIAFERRI had diverted to the TAG Virgin Islands
Account, failed to disclose that the funds had been diverted to

TAG in exchange for TAGLIAFERRI having placed client funds in investments relating to Company 1.  For example, in relation to the $150,000 that was diverted to TAG on or about June 11, 2007, the invoice falsely stated that this payment was for: "Financial Services related to:  Organizational Structure Public Offerings[,] SPACS[,] [and] Capital deployment."

20.  Beginning in or about July or August 2008, after JAMES TAGLIAFERRI, the defendant, learned of the SEC's inquiry, TAGLIAFERRI sent letters to certain clients deceptively stating that TAG had received "consulting fees" from Company 1 for things such as "financial advice."  In these letters, TAGLIAFERRI failed to disclose that TAG had received payments directly in exchange for investing client funds in investments in Company 1.

21.  For example, in a letter sent on or about September 2, 2008 to Victim 3, JAMES TAGLIAFERRI, the defendant, referenced having provided financial advice and assistance in discussions with potential buyers of Company 1.  The letter stated, in relevant part:

> For the record, we have provided financial advice to [Company 1] and are representing the company in its discussions wi[th] prospective buyers. For these services, we have received consulting fees.  This raises the potential for a conflict of interest among TAG VI, its clients and [Company 1].  I'd be happy to discuss these arrangements at your convenience.

This letter was false and misleading and omitted material facts. The letter failed to disclose that TAG received compensation from

Company 1 in exchange for TAGLIAFERRI's investment of client funds in Company 1.

22.   In total, JAMES TAGLIAFERRI, the defendant, placed at least $40 million of client funds in investments relating to Company 1 and received at least approximately $1.6 million in undisclosed and unauthorized fees relating to Company 1.

B.   **Payments Relating to the Associate Companies**

23.   From in or about January 2008 to at least in or about September 2009, JAMES TAGLIAFERRI, the defendant, also received undisclosed compensation in exchange for investing client funds in several entities affiliated with Associate 1 and Associate 1's brother (collectively, the Associate Companies, including Company 2).   For example, TAGLIAFERRI invested client funds into entities that included Company 2, as well as a holding company that owned Associate 1's primary residence in Beverly Hills, California.   As a result of investing client funds in the Associate Companies, TAGLIAFERRI received approximately $1.75 million and approximately 500,000 shares of stock in Company 2.

24.   Like many of the undisclosed fees relating to his investment of client funds in Company 1, JAMES TAGLIAFERRI, the defendant, and the Associate Companies used client money to fund these undisclosed payments.   In order to do so, TAGLIAFERRI caused client funds to be routed through the Trust Account. TAGLIAFERRI then caused a portion of these client funds to be

diverted to the TAG Virgin Islands Account, which he did not disclose to his clients.

25.   For example, on or about January 31, 2008, JAMES TAGLIAFERRI, the defendant, caused to be wired approximately $1,150,000 of Victim 2's funds to the Trust Account.  Account statements for Victim 2 indicated that this transfer was for the purchase of a note in an Associate Company.  In truth and in fact, a portion of the client funds was diverted to the TAG Virgin Islands Account.  Specifically, on or about February 1, 2008, $1,000,000 was transferred from the Trust Account for the benefit of an Associate Company, and $25,0000 was transferred from the Trust Account to an account controlled by Associate 1's Brother, who was also involved with the Associate Companies.  On that same date, $100,000 was wired from the Trust Account to the TAG Virgin Islands Account.

26.   On another occasion, between in or about February 27, 2008 and March 3, 2008, JAMES TAGLIAFERRI, the defendant, caused to be wired approximately $1,325,000 of client funds to the Trust Account.  This included, among amounts from other TAG clients, approximately $50,000 from a particular TAG client ("Victim 4").  Account statements for these TAG clients, including Victim 4, indicated that this transfer was for the purchase of notes in an Associate Company.  In truth and in fact, a portion of these client funds was diverted to the TAG Virgin

13

Islands Account.  Specifically, on or about February 28, 2008, $575,000 was transferred out of the Trust Account to a bank account controlled by Associate 1's Brother.  On or about March 4, 2008, an additional $245,000 was transferred to that account, for a total of $820,000.  On that same date, $250,000 was wired from the Trust Account to the TAG Virgin Islands Account.

27.  On a third occasion, on or about June 20, 2008 and June 26, 2008 respectively, JAMES TAGLIAFERRI, the defendant, caused to be wired approximately $1,080,660 and $655,350 of client funds to the Trust Account.  This included, among amounts from other TAG clients, approximately $260,400 from Victim 2 and $49,910 from Victim 3.  Account statements for these TAG clients, including Victim 2 and Victim 3, indicated that this transfer was for the purchase of shares of Company 2.  Between on or about June 23, 2008 and June 30, 2008, approximately $1,686,000 was transferred from the Trust Account to an account controlled by Associate 1's Brother.  Additionally, on or about July 1 and July 2, TAGLIAFERRI caused an additional $480,000 to be transferred from TAG client accounts to an account controlled by Associate 1's Brother.  Account statements for these TAG clients indicated that this transfer was for the purchase of shares of Company 2 and the purchase of notes in another Associate Company.  In total, TAGLIAFERRI caused over $2.1 million in TAG client funds to be transferred to accounts controlled by Associate 1's Brother

14

during this period.  In truth and in fact, a portion of these client funds was diverted to the TAG Virgin Islands Account. Specifically, on or about June 30, 2008 and July 2, 2008, two wires of $225,000 each were sent from an account controlled by Associate 1's Brother to the TAG Virgin Islands Account.

28.  In sum, JAMES TAGLIAFERRI, the defendant, caused his clients to purchase, at a total cost of at least $80,000,000 of his clients' funds, securities in the Associate Companies, including shares in publicly-traded Associate Companies and notes relating to additional Associate Companies.  As a result of doing so, TAGLIAFERRI received at least $1.75 million in undisclosed fees.

29.  JAMES TAGLIAFERRI, the defendant, did not disclose to clients that he had received payments in exchange for investing his clients' funds in the Associate Companies.

30.  Between in or about 2007 and 2010, JAMES TAGLIAFERRI, the defendant, used these undisclosed fees, which were placed in the TAG Virgin Islands Account along with other funds, for a variety of expenses, including to transfer funds to himself and the co-owner of TAG, to pay credit card bills, and to pay salary and overhead relating to TAG.  During this time period, for example, TAGLIAFERRI transferred to himself at least $1.7 million from the TAG Virgin Islands Account and the co-owner of TAG received approximately $1.6 million from this account.

15

## TAGLIAFERRI Used Client Funds For His Own Benefit, Including to Repay Other Clients and Make Additional Expenditures

31.    In addition to orchestrating the secret payments to himself described above, JAMES TAGLIAFERRI, the defendant, used client funds for his own benefit, including to make payments to other clients who were demanding the return of their funds and to make payments for the benefit of companies with which TAGLIAFERRI was affiliated, including Company 1.

32.    In order to deceptively obtain client funds for these purposes, JAMES TAGLIAFERRI, the defendant, directed a complex series of securities trades among and between client accounts that TAGLIAFERRI controlled.  These trades allowed TAGLIAFERRI to withdraw funds out of TAG client accounts for his own benefit, while creating the false and fraudulent appearance that the transactions were for the benefit of his clients.

33.    To withdraw funds from TAG client accounts, JAMES TAGLIAFERRI, the defendant, caused certain clients to purchase shares in Company 2 and other publicly-traded Associate Companies.  TAGLIAFERRI caused these clients to purchase shares from other client accounts that he also controlled and that were held in the names of certain of the Associate Companies (the Intermediary Accounts).  As a result of the sales of these shares, TAG client funds were transferred into these Intermediary Accounts.

16

34.   Once these client funds were transferred into the Intermediary Accounts, JAMES TAGLIAFERRI, the defendant, used the funds, among other things, to redeem notes held by other TAG clients who were demanding their money or to make payments for other expenditures.   In sum, TAGLIAFERRI caused clients to purchase securities from the Intermediary Accounts not for his clients' benefit, but rather so that TAGLIAFERRI could use their funds as he needed.

**A.   TAGLIAFERRI Used Client Funds to Repay Other Clients**

35.   On or about March 9, 2010, Victim 3 sent JAMES TAGLIAFERRI, the defendant, an email complaining about the status of the redemption of a note issued by a particular Associate Company that was past due and therefore in default.   On or about March 10, 2010, the next day, TAGLIAFERRI wrote back to Victim 3 that the "proceeds [of the Note] are to be credited [to Victim 3's account] tomorrow."

36.   In order to generate money to repay Victim 3, among other clients who held notes that were past due, on or about March 11, 2010, the next day, JAMES TAGLIAFERRI, the defendant, caused several TAG clients to purchase shares of Company 2 from an Intermediary Account for a total of over $700,000.   The following day, on March 12, 2010, TAGLIAFERRI used the proceeds from the sale, now in this Intermediary Account, to make payments to a number of clients, including Victim 3.

17

37.   On another occasion, on or about April 6, 2010,
JAMES TAGLIAFERRI, the defendant, needed to repay a client who
held a note in another Associate Company with a face value of
$463,994.   In order to generate sufficient funds to repay this
client, TAGLIAFERRI caused various other TAG clients to purchase
shares in Company 2 from an Intermediary Account for a total of
approximately $469,000.   TAGLIAFERRI then used these TAG client
funds generated from that sale, now held in the Intermediary
Account, to repay the client for the outstanding note.

38.   On or about April 3, 2010, JAMES TAGLIAFERRI, the
defendant, wrote an email to Associate 1's Brother explaining
that he (TAGLIAFERRI) was "trying to help" Associate 1 and
Associate 1's Brother with respect to their obligations under
promissory notes held by TAG clients in various Associate
Companies.   Specifically, TAGLIAFERRI explained that he had
caused certain of his clients to buy Company 2 shares from the
Associate Companies.   (As noted above, these shares were held in
the Intermediary Accounts, that is, Associate Company accounts
controlled by TAGLIAFERRI).   TAGLIAFERRI further explained that
he then used the client money generated from the sale of Company
2 shares to make payments to other TAG clients who held notes in
the Associate Companies.   Specifically, once client funds were
placed in an Intermediary Account, TAGLIAFERRI caused the
Associate Company holding the Intermediary Account to make

18

payments to other TAG clients.  Put more simply, through these
transactions, TAGLIAFERRI used funds from certain TAG clients to
pay off obligations owed to other TAG clients.  TAGLIAFERRI
wrote, in relevant part:

> On my own, I'm trying to help you.  The [Company 2]
> shares you transferred are being sold to clients.  With
> those proceeds, you're buying back your own notes.

39.  In this same email, JAMES TAGLIAFERRI, the
defendant, asked when TAG would receive a substantial sum of
money relating to a particular business deal.  TAGLIAFERRI stated
that he needed $5-10 million "to take away the urgency of those
clamoring for their money" and then an additional $20-30 million
"to clear up all of your paper [referring to notes that TAG
clients held in the Associate Companies]."

40.  The following day, on or about April 4, 2010,
JAMES TAGLIAFERRI, the defendant, sent an email to Associate 1.
In this email, TAGLIAFERRI again stated that he had used client
funds generated by the sale of Company 2 shares from the
Intermediary Accounts to make payments to other TAG clients who
held notes in the Associate Companies and who were demanding
repayment.  TAGLIAFERRI further stated in the email that if he
received between $5 to $10 million from the anticipated business
deal, TAGLIAFERRI could "probably [] stave off disaster,"
referring to the funds owed to TAG clients relating to notes in
which TAGLIAFERRI had placed their funds.

B.    **TAGLIAFERRI Used Client Funds to Make Other Expenditures**

41.   JAMES TAGLIAFERRI, the defendant, also improperly used client funds for the benefit of other businesses in which TAGLIAFERRI had an interest, including Company 1.   TAGLIAFERRI used the same method of deceptive trading between client accounts described above in order to generate funds to use for this improper purpose.

42.   For example, on or about February 16, 2010, JAMES TAGLIAFERRI, the defendant, came to learn that Company 1 had to make an immediate payment of approximately $272,651 to an insurance company in order to avoid the cancellation of Company 1's insurance policy.   TAGLIAFERRI improperly used TAG client funds to make this payment on behalf of Company 1.   To do so, TAGLIAFERRI caused certain clients to purchase shares in Company 2 from an Intermediary Account.   Once the client funds were transferred to this Intermediary Account, TAGLIAFERRI used these client funds to pay Company 1's insurance premium payment.

43.   Specifically, on or about February 22, 2010, JAMES TAGLIAFERRI, the defendant, sent an email to an employee of TAG (the "TAG Employee").   This email set forth the following instructions, in relevant part, with TAG client accounts referred to by internal numerical identifiers:

We need to make another insurance premium payment []. . . The amount is $272,651.

The wire should come from [a particular Intermediary Account].  In order to raise the cash necessary, pls sell [Company 2 shares] @ $0.50/share as follows:

200 [thousand] shares ($100 [thousand]), [Client 46]; 100 [thousand] shares ($50 [thousand]); [Client 47]; 150 [thousand] shares ($75 [thousand]), [Client 306]; 50 [thousand] shares ($25 [thousand)], [Client 323]; and 40 [thousand] shares ([$20 thousand]), [Client 150].

The wire must go today; so if you can't complete the transfer of the shares, we'll do it tomorrow.

[The Associate Company holding the Intermediary Account] will receive [Company 1] stock @$6/share.  We can do that tomorrow as well.  Thanks, J[.]

44.  JAMES TAGLIAFERRI, the defendant, caused his clients to purchase these securities not for their benefit, but for the purpose of generating funds to make an insurance payment on behalf of Company 1.  Upon completing the transactions described above, TAGLIAFERRI caused funds to be wired to a bank account in Manhattan as directed by the insurance company for Company 1.

## TAGLIAFERRI Placed Fictitious Securities in Client Accounts

45.  Also as part of his fraudulent scheme, JAMES TAGLIAFERRI, the defendant, created fictitious securities, which he referred to as "Sub Notes," that he placed in the accounts of various TAG clients.

46.  The Sub Notes, which were signed by JAMES TAGLIAFERRI, the defendant, generally indicated that Company 3 had executed a note with TAG (the "Note") committing Company 3 to

repay TAG funds that it had borrowed, along with interest.  These Sub Notes further stated that Company 3 promised to pay the TAG client holding the Sub Note a portion of the funds that Company 3 was obligated to pay TAG under the Note.

47.  These Sub Notes were materially false and fraudulent.  In truth and in fact, and as JAMES TAGLIAFERRI, the defendant, well knew, the purported Note between Company 3 and TAG that was referenced in the Sub Notes did not exist.  In other words, there was no debt that Company 3 had obligated itself to pay TAG, and no such Note existed.  Contrary to the representations in the Sub Notes, Company 3 had never agreed to any payment obligation with respect to TAG or TAG clients.  Accordingly, the Sub Notes which TAGLIAFERRI caused to be placed in various client accounts that referenced a payment to the holder of the Sub Note were materially false and fraudulent.

## Statutory Allegations

48.  From at least in or about 2007 through and including in or about 2010, in the Southern District of New York and elsewhere, JAMES TAGLIAFERRI, the defendant, acting as an investment adviser with respect to TAG clients, willfully and knowingly, used the mails and other means and instrumentalities of interstate commerce, directly and indirectly, (a) to employ a device, scheme, and artifice to defraud a client and prospective client; (b) to engage in a transaction, practice, and course of

business which operated as a fraud and deceit upon a client and prospective client; and (c) to engage in an act, practice, and course of business which was fraudulent, deceptive, and manipulative, to wit, TAGLIAFERRI (i) caused his clients to invest in certain securities in exchange for receiving undisclosed payments, (ii) used client funds to make payments to other clients and to pay expenses on behalf of companies with which TAGLIAFERRI was affiliated, and (iii) caused fictitious securities instruments to be placed in TAG client accounts.

(Title 15, United States Code, Sections 80b-6 & 80b-17; Title 18, United States Code, Section 2.)

## COUNT TWO

(Securities Fraud)

The Grand Jury further charges:

49.   The allegations contained in paragraphs 1 through 47 of this Indictment are repeated and realleged as though fully set forth herein.

50.   From at least in or about 2007 through and including in or about 2010, in the Southern District of New York and elsewhere, JAMES TAGLIAFERRI, the defendant, willfully and knowingly, directly and indirectly, by the use of a means or instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title

17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, to wit, TAGLIAFERRI (i) caused his clients to invest in certain securities in exchange for receiving undisclosed payments, (ii) used client funds to make payments to other clients and to pay expenses on behalf of companies with which TAGLIAFERRI was affiliated, and (iii) caused fictitious securities instruments to be placed in TAG client accounts.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNTS THREE THROUGH SEVEN

(Wire Fraud)

The Grand Jury further charges:

51.   The allegations contained in paragraphs 1 through 47 of this Indictment are repeated and realleged as though fully set forth herein.

52.   From at least in or about 2007 through and including in or about 2010, in the Southern District of New York and elsewhere, JAMES TAGLIAFERRI, the defendant, willfully and

24

knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, TAGLIAFERRI (i) caused his clients to invest in certain securities in exchange for receiving undisclosed payments, (ii) used client funds to make payments to other clients and to pay expenses on behalf of companies with which TAGLIAFERRI was affiliated, and (iii) caused fictitious securities instruments to be placed in TAG client accounts.  Specifically, on or about the dates set forth below, TAGLIAFERRI caused to following wire transmissions in furtherance of the scheme to defraud set forth herein:

| COUNT | DATE | Wire |
|-------|------|------|
| 3 | 3/3/2008 | Fax from TAG to a financial institution in New York, New York directing transfer of $50,000 from a Victim 4 account to the Trust Account |
| 4 | 4/25/2008 | Fax from TAG to a financial institution in New York, New York directing transfer of approximately $442,000 from a Victim 2 account to a Company 1 account |

| COUNT | DATE | Wire |
|:-----:|:----:|------|
| 5 | 6/20/2008 | Fax from TAG to a financial institution in New York, New York directing transfer of $1,080,660 in TAG client funds to the Trust Account |
| 6 | 12/5/2008 | Fax from TAG to a financial institution in New York, New York directing issuance of a check made payable to TAG from a Victim 1 account in the amount of approximately $1,286 for an investment advisory fee |
| 7 | 2/22/2010 | Wire transfer of approximately $272,651 of TAG client funds to a bank account maintained in New York, New York for payment of insurance premium for Company 1 |

(Title 18, United States Code, Sections 1343 and 2.)

## COUNTS EIGHT THROUGH FIFTEEN

(Travel Act)

The Grand Jury further charges:

53.   The allegations contained in paragraphs 1 through 47 of this Indictment are repeated and realleged as though fully set forth herein.

54.   From at least in or about 2007 through and including in or about 2009, in the Southern District of New York and elsewhere, JAMES TAGLIAFERRI, the defendant, willfully and knowingly, would and did travel in interstate commerce and use the mails and facilities in interstate and foreign commerce, with intent to distribute the proceeds of unlawful activity,

specifically, commercial bribe receiving, in violation of New York State Penal Law Sections 180.08 and 180.05, and to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of such unlawful activity; and thereafter would and did perform and attempt to perform acts to distribute the proceeds of such unlawful activity and to otherwise promote, manage, establish, carry on, facilitate the promotion, management, establishment, and carrying on of such unlawful activity, in violation of Title 18, United States Code, Sections 1952(a)(1)(A) and 1952(a)(3)(A), to wit, TAGLIAFERRI caused his clients to invest in certain securities in exchange for receiving undisclosed payments. Specifically, on or about the dates set forth below, TAGLIAFERRI used and caused to be used the mails and facilities in interstate and foreign commerce and performed and caused to be performed the following acts to distribute the proceeds of unlawful activity as set forth herein and to otherwise promote, manage, establish, carry on, facilitate the promotion, management, establishment, and carrying on of such unlawful activity as set forth herein:

| COUNT | DATE | Wire |
|-------|------|------|
| 8 | 2/28/2008 | Wire Transfer of $575,000 from the Trust Account to an account controlled by Associate 1's Brother in California |

| COUNT | DATE | Wire |
|-------|------|------|
| 9 | 3/4/2008 | Wire Transfer of $245,000 from the Trust Account to an account controlled by Associate 1's Brother in California |
| 10 | 3/4/2008 | Wire Transfer of $250,000 from the Trust Account to the TAG Virgin Islands Account |
| 11 | 3/6/2008 | Fax from TAG to a financial institution in New York, New York directing transfer of $100,000 from a TAG client account to a Company 1 account |
| 12 | 6/23/2008 | Wire Transfer of $1,000,000 from the Trust Account to an account controlled by Associate 1's Brother in California |
| 13 | 6/30/2008 | Wire Transfer of $686,000 from the Trust Account to an account controlled by Associate 1's Brother in California |
| 14 | 7/1/2008 | Fax from TAG to a financial institution in New York, New York directing transfer of $390,000 from TAG client accounts to an account controlled by Associate 1's Brother in California |
| 15 | 7/2/2008 | Fax from TAG to a financial institution in New York, New York directing transfer of $90,000 from TAG client accounts to an account controlled by Associate 1's Brother in California |

(Title 18, United States Code, Sections 1952 and 2.)

## FORFEITURE ALLEGATION

### (Counts Two Through Fifteen)

55.   As the result of committing one or more of offenses alleged in Counts Two through Fifteen of this Indictment, JAMES TAGLIAFERRI, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes and is derived, directly and indirectly, from gross proceeds traceable to the commission of the offenses, including but not limited to $4.3 million in fees clients paid to TAG for his services as their investment adviser, and at least $3.35 million in undisclosed compensation and other payments that TAGLIAFERRI received as part of the scheme.

### Substitute Asset Provision

56.   If any of the forfeitable property described above, as a result of any act or omission of the defendant:

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third person;

    c.   has been placed beyond the jurisdiction of the Court;

    d.   has been substantially diminished in value; or

29

      e.    has been commingled with other property which

           cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p), to seek forfeiture of any

other property of said defendant up to the value of the above

forfeitable property.

    (Title 18, United States Code, Section 981(a)(1)(C); Title 21,
          United States Code, Section 853(p);
        Title 28, United States Code, Section 2461.)

GRAND JURY FOREPERSON

PREET BHARARA
United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

JAMES TAGLIAFERRI,

Defendant.

## INDICTMENT

13 Cr. _____ (_____)

(Title 15, United States Code,
Sections 78j(b) and 78ff, 80b-6 and
80b-17; Title 18, United States Code,
Sections 1343, 1952, and 2.)

_____   PREET BHARARA
                                   United States Attorney.

A TRUE BILL

_____
                                   Foreperson.

*2/14/13 -- Filed Sealed Indictment
A/W issued.   Judge Gorenstein
              U.S.M.J.*